Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
chd@fergusondurham.com
ISB No. 6428

Attorney for Petitioner

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MARK DOUGLAS HUBER,<br><br>  Petitioner,<br><br>  v.<br><br>RANDY VALLEY, Warden,<br><br>  Respondent. | Case No.  1:23-cv-39<br><br>**PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**28 U.S.C. § 2254** |

The state of Idaho is holding Mark Douglas Huber in violation of the United States Constitution. He seeks a writ of habeas corpus directing Respondent to release him from his unconstitutional confinement or retry him within a reasonable time.

## JURISDICTION

1.      The Court has jurisdiction under Art. I, sec. 9, cl. 2 of the United States

Constitution, 28 U.S.C. § 2241, and 28 U.S.C. § 2254.

## PARTIES

2.      Idaho state prisoner Mark Huber resides at the Idaho State Correctional

Center pursuant to a January 31, 2012 Amended Judgment and Sentence. Exhibit A. The

Honorable Fred M. Gibler sentenced Huber to 30 years in prison, with 15 years fixed,

for rape and to a concurrent term of 30 years in prison, with 15 years fixed for lewd

conduct with a minor. *Id*.

3.      Respondent Randy Valley is the Warden at the Idaho State Correctional

Center and is responsible for Huber's custody and care.

## BACKGROUND

4.      This case stems from a claim that a sexual assault occurred in Joseph

Haws' one-bedroom home in Kellogg, Idaho, during the overnight hours of October 25-

26, 2010.

5.      The alleged victim was Haws' 14-year-old daughter, D.V.

6.      The State's theory of this case was that Haws arranged with Mark Huber

to have sexual contact with D.V. that night.

7.      Huber admitted to law enforcement that he was at Haws's home, and saw

D.V. there, but did not have sexual contact with her.

8. The State charged Huber in a criminal complaint with one count of rape and one count of lewd conduct with the minor. It also included a sentencing enhancement, alleging that Huber was a persistent violator.

9. Huber retained counsel, John Redal.

10. On Redal's advice, Huber waived a preliminary hearing. The magistrate court bound Huber over to the district court.

11. Redal filed no pretrial motions, other than a motion to reduce bond, and sought no expert assistance.

12. The case proceeded to a jury trial.

13. Huber did not testify. He was convicted as charged.

14. The district court originally sentenced Huber to 30 years in prison, with 10 years determinate on each count. It ordered those to run concurrently.

15. The State filed a motion to correct the sentence under Idaho Criminal Rule 35, arguing that the persistent violator charged required at least 15 years fixed.

16. The court granted the State's motion, denied Huber's Rule 35 motion, and resentenced Huber in an amended judgment to a controlling term on the two counts to 30 years in prison with 15 years fixed. Ex. A.

17. Huber appealed.

18. Redal withdrew as Huber's counsel, replaced by the public defender.

19.     While the appeal was pending, Huber filed a pro se motion for new trial. The public defender amended the motion.

20.     The public defender was replaced by John Rose. Rose supplemented the motion for new trial with additional evidence that he had developed.

21.     The district court denied the motion for new trial.

22.     On direct appeal, Huber's appointed counsel raised a single issue: that the sentence was excessive. The Idaho Court of Appeals affirmed.

23.     While the direct appeal was pending, Huber filed a pro se petition for post-conviction relief, which was stayed.

24.     After the appeal was over, Huber amended his petition raising, among other things, claims of actual innocence and ineffective assistance of trial and appellate counsel.

25.     The court appointed John Rose again as Huber's counsel.

26.     Rose sought, and was granted, permission to depose trial counsel Redal.

27.     The court also granted Rose's motion for funds to hire a DNA expert.

28.     But Rose became ill during the proceeding and withdrew.

29.     New counsel, James McMillan, was appointed.

30.     McMillan did not follow up on Rose's previous work. He failed to provide the district court with the evidence supporting the petition. Eventually, the district court dismissed Huber's petition for post-conviction relief.

4

31.     Huber filed motions to reconsider, which were denied.

32.     The district court refused to appoint counsel on appeal. Huber was forced to represent himself, and the Court of Appeals affirmed.

33.     Huber filed a second petition for post-conviction relief, again raising claims of actual innocence and ineffective assistance of counsel. Among other things, he argued that his previous post-conviction counsel had been ineffective. The district court did not appoint counsel, and again summarily dismissed the petition.

34.     The court clerk failed to give Huber notice of the dismissal for months, but with newly retained counsel he was able to file a timely notice of appeal.

35.     Huber decided to voluntarily dismiss the appeal from his second post-conviction petition and file this habeas corpus petition.

36.     After the application of statutory tolling under 28 U.S.C. § 2244(d)(2) for Huber's properly filed applications for post-conviction relief in state court, this petition has been filed within one year that Huber's judgment became final in state court.

## GROUNDS FOR RELIEF

### I.

**Mark Huber was deprived of his Sixth Amendment right to the effective assistance of counsel at his criminal trial.**

37.     Huber had a right to the effective assistance of trial counsel under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment.

38.     Huber was deprived of his constitutional right to the effective assistance of counsel because his appointed counsel failed to conduct a reasonable investigation, prepare for trial, or present an adequate defense to the criminal charges.

39.     These failures fell below an objective standard of reasonable professional competence.

40.     But for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different.

41.     The instances of trial counsel's ineffectiveness are established, either individually or cumulatively, by the following.

**A.     Trial counsel was ineffective in failing to investigate and challenge the scientific evidence.**

*(i)     Failure to investigate and present expert testimony regarding the State's DNA test "results."*

42.     As in most sexual assault cases, the State's case rested, in part, on forensic evidence.

43.     Rylene Nowlin, an analyst at the Idaho State Police lab, performed DNA testing.

44.     Nowlin testified that she had conducted a test on a swab that was labeled "outside peri area," presumably meaning a swab of D.V.'s perineum.

45.     Another lab technician had earlier tested the swab and found that it was positive for amylase.

46.     Nowlin testified that "high concentrations of amylase" would be an "indication that saliva may be present on a sample," though she conceded that amylase is also present in vaginal fluid. Part of D.V.'s claim was that the man who sexually assaulted had preformed oral sex on her.

47.     From that sample, Nowlin developed a major DNA profile and a minor DNA profile, meaning that the sample was a mixture form more than one contributor.

48.     She compared the mixture's profile to D.V.'s known DNA profile and Huber's known DNA profile.

49.     The major profile from this sample was consistent with D.V.'s profile.

50.     As to the minor profile, Nowlin testified that "while everything was consistent with Mr. Huber, there was too small an amount – there wasn't enough present for me to draw any conclusions as to whether or not it actually is Mr. Huber's DNA." JT Tr., p. 302.

51.     At the prosecutor's urging, however, Nowlin reiterated more than once that the minor profile was "consistent with" Huber.

52.     The minor profile, though "was very low level." JT Tr., p. 304.

53.     Defense Attorney Redal's cross-examination of Rowlin covered two pages of transcript. He asked five questions.

54.     Then, on redirect, at the prosecutor's urging, Nowlin offered an enormous statistic to the jury. She claimed that "one in every 230 billion unrelated individuals would be expected to contribute to that mixture." JT Tr., p. 308.

55.     Redal did not consult with a DNA expert before trial. He was completely unprepared to confront this evidence or effectively cross-examine Rowlin.

56.     A defense attorney, acting reasonably, would have consulted with such an expert in a case in which the State intended to rely on DNA evidence. This is specialized knowledge that lies well outside an attorney's own expertise.

57.     Redal's failure to do so was objectively unreasonable.

58.     In the post-conviction matter, Huber eventually was able to hire a DNA expert, Dr. Greg Hampikian.

59.     Dr. Hampikian offered several material criticisms of the State's DNA evidence.

60.     First, he concluded that the Idaho State Lab's procedures – which included failing to adequately separate the suspect's reference sample from the evidence to be tested  – could have resulted in introducing a minute amount of Huber's DNA through the process of cross-contamination.

61.     Also, according to Dr. Hampikian, the DNA that was found in the mixture had so little male DNA that there is no Y chromosome peak at a certain locus. This meant that the sample was overwhelmingly female and that the male contribution, if

any, was very little. Again, a marker of potential cross-contamination or a possibility

that the mixture did not contain male DNA at all.

62.    While Nowlin found that Huber's DNA was consistent at eight "peaks,"

she normally looked at 32, which was why she could not say that it matched him. Yet

Hampikian reviewed those results and concluded that an artefact called "stutter"

should have dropped the peak consistencies even further. That meant fewer loci

matched Huber's known DNA profile.

63.    Dr. Hampikian could have further explained that Nowlin's eye-popping 1

in 230 billion statistic was meaningless, and simply wrong.

64.    Even setting aside the possibilities for cross-contamination, Dr.

Hampikian calculated that this mixture is 3,459 times more likely assuming that Huber

and D.V. are the contributors, rather than assuming, as Nowlin did, that D.V. and some

unknown unrelated person are the contributors.  This is many orders of magnitude

below what the State suggested the probabilities were at trial.

65.    After Dr. Hampikian came on board, the Nowlin amended her report

(well after trial) to include her opinion that, assuming D.V. and Huber were

contributors, it was 1 in 150,000 times more likely. This lower number, which is dubious

anyway, was never presented to the jury.

<u>Failure to file a motion in limine</u>

66.     Armed with expert support like Hampikian's opinion, Redal could have filed a motion in limine to exclude the DNA "results" altogether.

67.     Nowlin's testimony was irrelevant and confusing to the jury and, ultimately, unduly prejudicial.

68.     It was irrelevant because she did not say what the likelihood was that Huber was the donor of the partial profile as compared to anyone in the population at large. To do that, she would have needed to run the partial profile through a database, calculating how many profiles could also not be "excluded," as she testified about Huber.

69.     It was confusing because it was not clear what her 1 in 230,000,000,000 statistic meant. Reasonably, a jury of lay people could assume those were the odds that anyone other than Huber was the contributor. That is flat wrong.

70.     It appears that Nowlin meant that the odds of that particular mixture arising generally – without regard to who the minor contributor was – were 1 in 230,000,000,000. That tells the jury nothing about the likelihood of whether Huber contributed to the mixture.

71.     For these reasons, it was objectively unreasonable not to file a motion in limine seeking exclusion of Nowlin's testimony.

<u>Failure to consult with an expert to prepare for cross-examination or present the expert's testimony at trial</u>

72.     Independently, it was objectively unreasonable not to cross-examine Nowlin after consulting with an expert like Hampikian to draw out facts consistent with Hampikian's findings.

73.     Third, was further objectively unreasonable not to present an expert as part of the defense case.

<u>Prejudice</u>

74.     Had Redal done any, or all of these things, there is a reasonable probability of a different outcome.

75.     There is no reasonable strategic or tactical reason not to investigate the DNA evidence, contact an expert, and develop favorable defense evidence to challenge the State's claims.

76.     It is reasonably probable that the district court would have granted a motion in limine to exclude irrelevant evidence that had a substantial likelihood of confusing the jury and prejudicing Huber.

77.     It is reasonably probable that even if Nowlin's testimony were admitted, cross-examination along the lines of Hampikian's opinions would exposed the "results" as nothing of the sort and would have led to a not guilty verdict.

78.     It is equally reasonably probable  that had a defense expert testified to these matters, the outcome would have been different.

*(ii)*      *Failure to object to the admission of a non-testifying laboratory analyst's opinions in an exhibit and through another witness.*

79.      Kerry Russell, another analyst at the Idaho State Police lab, conducted tests on the evidentiary items to determine whether bodily fluid was present.

80.      She concluded that a single sperm was present on D.V.'s panties, but decided that it could not be further tested.

81.      She also completed the tested that was positive for amylase, which the State later claimed showed the presence of saliva and that Huber could not be excluded as a contributor to the peri area sample.

82.      Russell did not testify.

83.      When the prosecutor offered her report as an exhibit, Redal did not object, and it was introduced.

84.      Huber had a Sixth Amendment right to confront his accusers.

85.      The Confrontation Clause prohibits the State's use of out of court "testimonial" statements, unless the defendant has had a previous opportunity to cross-examine the declarant.

86.      This includes the right to confront lab technicians who prepare reports that contain statements that are intended to be used in the defendant's criminal prosecution.

87.     It was objectively unreasonable for Redal not to object to the admission of Russel's report on the ground of protecting Huber's right to confrontation.

88.     It was also objectively unreasonable for Redal not to object to Nowlin's testimony that relayed to the jury Russell's test results. That included Russell's opinion that the peri area swab was positive for "amylase."

89.     The "sperm" and the "amylase" evidence was extremely damaging to Huber. The presence of the sperm suggested a sexual assault. The State used the presence of amylase to argue that Huber had performed oral sex on D.V., as she had claimed.

90.     Had Redal objected, there is a reasonable probability that the judge would have excluded this evidence under the Confrontation Clause. Had it been excluded, there is a reasonable probability that jury would have acquitted due to D.V.'s credibility problems.

**(iii)    *Failure to develop and present evidence of Huber's vasectomy.***

91.     Redal was ineffective for yet another reason regarding the "sperm" evidence.

92.     Kerry Russel's opinion was that "semen" was present in D.V.'s panties due to the presence the spermatozoon.

93.     Semen was not detected on any other evidentiary item, despite medical professionals swabbing D.V.'s vagina, anal area, perineum, and neck.

13

94.     The State claimed that Huber raped D.V. by having intercourse with her against her will.

95.     The finding of the spermatozoon in D.V.'s underwear was used to support that charge.

96.     During this alleged rape, D.V. testified that Huber exclaimed three times that he was "coming," strongly implying that ejaculated. She also testified that while she was forced to perform oral sex on him, he said "I'm coming" once.

97.     Approximately twenty years before this incident, however, Mark Huber had had a vasectomy. He was sterile. Previous testing showed that his semen had no detectable sperm in it.

98.     Before trial, Huber told his counsel, Redal, that he had had a vasectomy. He gave Redal the name of the local doctor who performed the procedure. He told Redal that because of the vasectomy, he could not be the source of the sperm in D.V.'s underwear, meaning that the "semen" that was detected there must be from someone else.

99.     Yet Redal did nothing to investigate that claim. He did not contact the doctor to confirm. He did not investigate the issue at all.

100.    A reasonably competent defense attorney would have investigated Huber's claim given the State's reliance on this evidence.

101.    Had he done so, Redal would have easily discovered confirming evidence of Huber's vasectomy. That robust evidence was presented in Huber's post-conviction proceedings.

102.    There is no reasonable strategic or tactical reason not to investigate, develop, and present that evidence

103.    Given that Huber could produce no sperm through ejaculation, then that evidence tends to prove that he could not have been the donor of the sperm found in this case.

104.    If he is not the donor, then there is a reasonable doubt that he raped D.V.

105.    This error is compounded by the fact that D.V. implied that Huber ejaculated – exclaiming several times during the lengthy encounter that he was "coming" –  and yet semen was found nowhere on her less than 24 hours later, other than through the presence of a single sperm in her panties.

106.    A man with a vasectomy still produces semen, just not sperm. Had Huber committed this crime as D.V. described, the lab should have found evidence of semen in abundance. It did not.

107.    Had Redal presented this evidence, there is a reasonable probability that the jury would found Huber not guilty of sexually assaulting D.V.

**B.**      **Trial counsel was ineffective in failing to impeach Officer Gary Yergler's**

**testimony that Huber had admitted to him that he "thought that girl was**

**old enough" and, moreover, that Huber never denied that he had sexual**

**contact with D.V.**

108.      Officer Gary Yergler was one of the lead investigators.

109.      He arrested Huber and drove him to the jail.

110.      During that ride, he surreptitiously recorded their conversation.

111.      At trial, he testified about that conversation.

112.      He told the jury that Huber told him that "I thought the girl was old

enough." And that "I didn't know that girl was underage." JT Tr., p. 139.

113.      He claimed "that was pretty much the extent of what he said." *Id*.

114.      The prosecutor then asked specifically, "did he deny – did he later

indicate whether he had sexual contact with her or not?" *Id*.

115.      Yergler responded "I never asked that question." *Id*.

116.      On cross-examination, Yergler admitted that he failed to include this

conversation in his police report, but he explained that away by claiming he "shut it off

en route to the jail. He quieted down, and I just shut my recorder off." JT Tr., p. 142.

117.      The State disclosed in discovery to defense counsel Redal an audio

recording of the Yergler/Huber conversation in Yergler's car.

118.    Had Redal listened to that recording, he would have learned that Yergler was misrepresenting the conversation to such an extent as to turn a denial of culpability into an admission.

119.    Contrary to Yergler's testimony, Huber never told him he "thought that girl was old enough."

120.    Contrary to Yergler's testimony, Huber repeatedly claimed in that conversation that he was being "set up" and that he "never touched that girl." He told Yergler that Haws called him over to his house to get high. He told Yergler that "this is some bullshit." He asked Yergler "how in the hell did they come up with this story that I raped this little kid?" More than once, Yergler just told him he can tell it to the judge.

121.    Also contrary to Yergler's testimony, Yergler did not "shut off" the recording en route to the jail. He continued to record until he handed Huber over to the jailor. In fact, Yergler's conversations with a deputy at the jail are on the recording.

122.    Redal did not impeach Yergler with any of his untruths.

123.    Yergler's testimony was especially damning, because it amounted to an admission of guilt by Huber. While Huber *did* ask Yergler how old D.V. was, he never said that he thought she was "old enough" or that he "didn't know that girl was underage." The contrary is true. While Huber told Yergler that Haws had been asking him to come meet his daughter – who was "supposed to be 18" – when he saw her he knew she was not 18, and he "never touched her."

124.    A confession by the defendant is perhaps the most prejudicial evidence that can be introduced.

125.    Any reasonable defense attorney would have impeached Yergler with the clear inconsistencies between his testimony and the secret audio recording, particularly because Yergler admitted that he put none of this in his police report.

126.    There is no reasonable strategic or tactical reason not to impeach Yergler with that evidence.

127.    Had Redal done so, it is probable that the jury would have discounted one of the State's chief investigators as a liar. A taint on Yergler would have tainted the State's entire case.

128.    There is a reasonable probability that, but for counsel's errors with respect to cross-examining Yergler, the jury would have found Huber not guilty.

C.    **Trial counsel was ineffective in failing to impeach D.V.'s identification of Huber.**

129.    The State provided a police report to Redal as part of discovery that included D.V.'s initial statements.

130.    When the police first contacted her, they asked her to describe her assailant.

131.     She correctly identified a tattoo that Huber on his arm, which is unsurprising since Huber did not deny meeting her. Other than that, her out-of-court description was inconsistent with him.

132.     She said that he had "black or dark" pubic hair.

133.     Photos from the execution of a detention warrant on Huber show that he is fair haired with light pubic hair.

134.     D.V. said that the man was about six feet, two inches tall and a little heavy.

135.     Huber is about five feet, ten inches. He is of average to thin weight for that height.

136.     She said that he had a shaved head.

137.     Huber's head was not shaved.

138.     When asked, she did not mention that he had any other distinguishing marks.

139.     Yet Huber had a prominent surgical scar on his lower abdomen.

140.     At trial, the prosecutor asked D.V. whether she could "recognize" the man from the night of the incident. She said she could. JT Tr., p. 212.

141.     The prosecutor asked, "could you tell the jury where he's sitting and what he's wearing?" *Id.*

142.    She replied, "He's wearing the blue plaid shirt, which is rather dressy, and he's sitting by a young man with a black shirt and tie." *Id*.

143.    Huber was the man with the black shirt and tie. His attorney was in the "rather dressy" blue plaid shirt. D.V. had identified attorney Redal, not Huber.

144.    Huber urged Redal to point out the misidentification, but he did nothing.

145.    More than that, given the shaky in-court identification, a reasonable defense attorney would have cross examined D.V. regarding how her out-of-court statements about the man who assaulted her were inconsistent with Huber.

146.    Redal's cross-examination of D.V. covered about nine pages of transcript.

147.    Redal's failure to object and move to strike the in-court identification, which are always inherently suggestive but here involved a misidentification, was objectively unreasonable.

148.    Redal's failure to cross examine D.V. to draw out the material inconsistencies in her pretrial description with Huber's actual characteristics was objectively unreasonable.

149.    There is no reasonable strategic or tactical reason for failing to follow those lines of inquiry.

150.    Had Redal done so, there is a reasonable probability that the jury would have had a reasonable doubt about whether Huber was D.V.'s assailant or whether D.V. was assaulted at all. Redal's errors prejudiced Huber.

**D.     Trial counsel was ineffective in failing to expose witness Gayanne**

**Windedahl's motive for supporting the State's accusations against Huber.**

151.    Gayanne Windedahl arrived at Joe Haws's home the night of the incident. She saw Huber as he was leaving.

152.    She claimed that she was going over to Haws's apartment to "visit" him.

153.    At trial, Windedahl testified that D.V. told her that Huber had "forced sex on her." JT Tr., p. 323.

154.    Redal had information in discovery that could have shown Windedahl's motive to be a friendly witness for the State.

155.    Windedahl actually went to Haws's apartment to buy drugs. He was her dealer.

156.    Yergler was the first to contact Windedahl after D.V. reported the incident. He asked her to write a statement. She was on probation at the time.

157.    Among other things, Yergler told her "here's the deal ... give me a detailed accounting ... in the future I'll pay you back." He asked if she was "still on probation." He told her that he "will owe you big time if you'll do this for me." He said that it would "pay dividends."

158.    This all provided a motive for Windedahl to support Yergler's, and the State's, theory of the case to pin this on Huber.

159.    Redal did not question Windedahl about why she might have felt pressured to tow the party line, including her desire to stay out of trouble for drug possession. He cross-examination amounted to only a few pages of transcript.

160.    Windedahl also had told investigating officers before trial that Haws had mentioned that he wanted Windedahl and him to have sex in front of D.V. or take a bath in front of her. Redal did not question her about that, either, which would have provided a potential alternative scenario where Haws and Windedahl had sex with D.V., or Haws himself did, rather than Huber.

161.    Any reasonable defense attorney would have impeached Windedahl with her bias and motives for testifying in the State's favor.

162.    There is no reasonable strategic or tactical reason not to do so.

163.    But for trial counsel's error, there is a reasonable probability of a different outcome.

## II.

**The State violated Mark Huber's right to due process of law under the Fourteenth Amendment when it failed to correct Officer Yergler's false testimony.**

164.    A prosecutor's knowing use of false testimony, or failure to correct false testimony, violates a defendant's right to a fair trial and due process of law under the Fourteenth Amendment. *See Napue v. Illinois*, 360 U.S. 264 (1959), and its progeny.

165.     Officer Yergler testified in a way that portrayed Huber as admitting his guilt to Yergler during a spontaneous conversation on the way to the police station. He also testified that Huber never denied committing the crime and that he (Yergler) simply shut off the recording because Huber "quieted down."

166.     As set out in Claim I.B, this testimony was false.

167.     The State was aware of the false testimony, because it had the audio recording in its possession.

168.     The prosecutor provided an opening for Yergler to say that Huber had denied committing the crime, asking him "but did he deny – did he later indicate whether he had sexual contact with D.V." JT Tr., p. 136. Yergler said he "never asked that question," creating the impression Huber did not deny committing the crime, which is entirely false. The prosecutor allowed the false impression to go uncorrected.

169.     This violated Huber's right to due process of law.

170.     A *Napue* violation requires that the conviction be set aside whenever there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir.2005) (en banc)

171.     Yergler was a key State's witness. His investigation touched every material piece of evidence against Huber, including D.V. and Gayanne Windedahl's statements. His credibility was critical to the State's case.

172.     An admission of guilt is the most incriminating evidence against a defendant. It comes out of the accused's own mouth. Here, Yergler gave the impression that Huber had admitted that he had sex with D.V., albeit after thinking she was over 18.

173.     There is a reasonable likelihood that this evidence affected the judgment of the jury.

## III.

**The State violated Mark Huber's right to due process of law when it failed to disclose the raw data generated during the Idaho State Police lab's forensic testing. That data contained evidence favorable to Huber, including evidence of "stutter" in the DNA mixture's alleged male profile, which counsel could have used to either impeach the State's DNA expert or to present independently in Huber's defense.**

174.     The State must disclose before trial all evidence that is favorable to the accused, meaning that it is exculpatory or impeaching. The failure to do so violates a defendant's right to due process of law if there is a reasonable probability that, had the evidence been disclose, the outcome would have been different. *Brady v. Maryland*, 373 U.S. 83 (1963),

175.     Before trial, the State did not disclose the raw data on which Rylene Nowlin based her testimony.

176.     During the post-conviction matter, that information was turned over.

24

177.    Dr. Hampikian reviewed the data and concluded that he saw a "stutter" effect, which reduces even further the matches that Huber's known profile had with DNA in the mixture from D.V.'s peri area.

178.    Dr. Hampikian further concluded that the Idaho State Lab's testing protocols could have resulted in cross-contamination.

179.    Defense counsel did not have this information, which was material that at least could have been used to impeach Nowlin.

180.    Huber was prejudiced.

181.    Had it been disclosed, and Nowlin questioned about it, or a defense expert called to testify, there is a reasonable probability that the jury would have discounted this forensic evidence entirely and found reasonable doubt about Huber's guilt.

## IV.

**Mark Huber is actually innocent of this crime. His conviction and continued incarceration violate his right to due process of law under the Fourteenth Amendment.**

182.    The United States Supreme Court has never squarely held that actual innocence is a freestanding basis for habeas relief.

183.    The Ninth Circuit, however, has assumed such a right exists. A habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating

doubt about his guilt, and must affirmatively prove that he is probably innocent.
*Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997).

184.    Huber can meet that standard here. Among other things, he has new DNA evidence that undermines the State's DNA results and statistics. D.V.'s pretrial description of her assailant is squarely inconsistent with Huber. The audio recording of Yergler's conversation with Huber supports his innocence. Windedahl had a motive to testify that D.V. had told her that Huber forced her to have sex.

185.    With the assistance of discovery in this matter, Huber anticipates developing additional evidence of his innocence.

186.    All of the evidence, old and new, should convince this Court that no reasonable trier or fact would now find Huber guilty beyond a reasonable doubt.

## EXHAUSTION OF STATE COURT REMEDIES

## AND THE APPLICATION OF AEDPA

187.    Huber has either fairly presented and properly exhausted all available state court remedies as to the claims presently raised in this petition, or he will be able to establish an exception so that any claim that the Court deems to be procedurally defaulted may be heard on the merits in this proceeding.

188.    Huber further alleges that he has been deprived of a full and fair opportunity to develop the evidentiary record in the state courts and he will seek additional discovery and fact-development in this proceeding.

189.    For any claim that is ultimately subject to the provisions of the Antiterror

and Effective Death Penalty Act (AEDPA), Huber will be able to show that the state

court's decision was contrary to or an unreasonable application of clearly established

federal law as determined by the United States Supreme Court. 28 U.S.C. 2254(d)(1). Or

he will be able to show that the state court's decision involved an unreasonable

determination of the facts in light of the evidence presented in the state court

proceeding. 28 U.S.C. 2254(d)(2).

### RELIEF REQUESTED

Petitioner respectfully requests:

1.      That Respondent be ordered to produce the relevant state court record.

2.      That leave to amend be given, if requested;

3.      That discovery be granted, if requested;

4.      That an evidentiary be held to resolve any material issues of fact;

5.      That the Court grant any other interim relief it deems necessary; and

6.      That this Court issue the Writ to Respondent ordering him to release Mark

Huber from custody if he is not re-tried within a reasonable time set by the

Court.

DATED this 24th day of January, 2023.

/s/Craig H. Durham
Attorney for Petitioner

**VERIFICATION**

I declare under penalty of perjury pursuant to the laws of the United States that the facts in this Petition are true and correct.

DATED:    1/21/2023

Mark Huber

EXHIBIT A

STATE OF IDAHO
COUNTY OF SHOSHONE/SS
FILED

**First Judicial District Court, State of Idaho**
**In and For the County of Shoshone** 31   PM 1: 21
700 Bank Street, Suite 120
**Wallace, Idaho  83873**

PEGGY WHITE
CLERK DIST COURT

By _____
DEPUTY

|  |  |
|---|---|
| **STATE OF IDAHO** | ) |
| **Plaintiff,** | ) **Case No:  CR-2010-0003214** |
|  | ) |
| **vs.** | ) **AMENDED** |
|  | ) **JUDGMENT AND SENTENCE** |
| **Mark Douglas Huber** | ) |
| **DOB:  3/11/1962** | ) |
|  | ) |
|  | ) |
| **Defendant.** | ) |
|  | ) |

    **The block checked below constitutes the Judgment and Sentence in the above matter(s).**

        [ ]     **ORDER WITHHOLDING JUDGMENT**
        [ ]     **ORDER RETAINED JURISDICTION**
        [X]     **JUDGMENT AND SENTENCE**

    On Monday, January 23, 2012, before the Honorable Fred M. Gibler, District Judge, you, Mark Douglas Huber, personally appeared before the Court on the Defendant's/State's Rule 35 Motion. Also appearing were Keisha L. Oxendine, Prosecuting Attorney for Shoshone County, Idaho and your lawyer, Erik P. Smith.

    **IT IS HEREBY ORDERED AND IT IS THE JUDGMENT OF THIS COURT** that you, Mark Douglas Huber,

[ ]    having been advised of and having waived your constitutional rights to a) trial by jury; b) remain silent; and c) confront witnesses, and thereafter having pled guilty to

[X]    having been found guilty by a jury of the criminal offenses charged in the Information on file herein as follows:

**Count 1 –   Viol. of I.C. 18-6101(1) or (4), Rape, a Felony**

**Count 2 -   Viol. of I.C. 18-1508, Lewd Conduct with a Minor Under Sixteen, a Felony**

239

1.

Information, Part II, Viol. of I.C 19-2520G, Mandatory/Minimum Sentencing Enhancement

**THAT YOU, MARK DOUGLAS HUBER, ARE GUILTY OF THE CRIMES SO CHARGED,** and now, therefore,

**[ ] IT IS HEREBY FURTHER ORDERED** that, pursuant to I.C. § 19-2513, you, Mark Douglas Huber, are sentenced as follows:

Count 1 – 15  years fixed;   15  years indeterminate; for a total term not to exceed 30  years.

Count 2 -  15   years fixed;  15  years indeterminate; for a total term not to exceed 30  years.

    **[X]**    **Concurrent**            **[ ]**    **Consecutive**

    **[ ]**    **RSAT Program Recommended**

    **[ ]**    **IT IS FURTHER ORDERED** that you, Mark Douglas Huber, shall be given credit for time served on the above sentence(s) as follows:

CR-2010-0003214                _454__ days

**[ ]**    **IT IS FURTHER ORDERED** that, the Court shall retain jurisdiction for pursuant to I.C. § 19-2601. Upon completion of said retain jurisdiction program Defendant shall be transported back to Shoshone County and to the custody of Shoshone County Public Safety Building.

    **THE COURT RECOMMENDS** for the defendant the following retained jurisdiction sentencing option:

    [] Correctional Alternative Placement Program (CAPP) **[RJCAPP]**

    [] Retained Jurisdiction (Traditional Rider) **[RJTR]**

    [] Therapeutic Community (TC Rider) **[RJTC]**

    [] No Recommendation **[RJNR]**

    [] Correction Alternative Placement Program (CAPP)  Followed by Problem Solving Court **[RJCAPS]**

**[X]**    **IT IS FURTHER ORDERED** that Mark Douglas Huber shall be committed to the custody of the Idaho State Board of Correction on date of the sentencing hearing.

[ ]     **IT IS FURTHER ORDERED** that pursuant to I.C. § 19-2601, Judgment and Sentence shall be withheld for a period of _____ years.

[ ]     **IT IS FURTHER ORDERED** that execution of the above sentence be suspended.

[ ]     **IT IS FURTHER ORDERED** that, you are placed on supervised probation for a period of _____ years upon the terms and conditions identified and set forth on the attached Schedule of Probation Terms and Conditions.

[X]     That you shall pay court costs and fees **$225.50; Drug related cases $265.50; $270.50 for felony DUI or $525.50 for sex crimes on each count or charge** as follows:

[ ]     That you shall pay additional costs, fees, restitution and reimbursements as follows:

|                                   |          |
|-----------------------------------|----------|
| g.  CS Work Comp                  | _____   |
| h.  CS Fee                        | 20.00    |
| i.  Reimburse defense costs       | 400.00   |
| j.  Reimburse prosecution costs   |          |
| k.  Reimburse district court fund | 100.00   |
| l.  Reimburse ISP Drug lab        | _____   |
| _____  | ___.___  |

[ ]     **IT IS FURTHER ORDERED** pursuant to **I.C. § 19-5302** that the court shall reserve jurisdiction to determine the amount of restitution you shall pay your victim(s) in this matter.  The amount shall be determined from time to time by stipulation or upon notice and hearing. Thereafter, a separate civil judgment shall be entered against you, Mark Douglas Huber, and in favor of your victims.  Such civil judgment shall bear statutory interest from the date of each offense.  Payment of restitution is a condition of probation.

[ ]     **IT IS FURTHER ORDERED** that defendant shall reimburse the Department of Correction for the cost of the presentence report in an amount not to exceed $100.00

[ ]     **IT IS FURTHER ORDERED** that any bail posted in this matter shall be exonerated, provided that any deposit shall be applied pursuant to **I.C. § 19-2923**.

[ ]     That in the presence of your probation officer, you shall on a certified copy of this order and the attached Schedule of Probation Terms and Conditions endorse your receipt of a copy of this order and shall have initialed your acceptance, agreement, and consent to each of the terms and conditions contained in this order and attachment.   Your probation officer shall return to the court the certified copy that contains your endorsement.

241

3.

## NOTICE OF RIGHT TO APPEAL

_____ Defendant agrees to waive his/her right to appeal as to conviction and sentence.

YOU, MARK DOUGLAS HUBER, ARE HEREBY NOTIFIED that you have the right to appeal this order to the Idaho Supreme Court. Any notice of appeal must be filed within forty-two (42) days of the entry of the written order in this matter.

YOU ARE FURTHER NOTIFIED that if you are unable to pay the costs of an appeal, you have the right to apply for leave to appeal in forma pauperis or to apply for the appointment of counsel at public expense. If you have questions concerning your right to appeal, you should consult your present lawyer.

DATED this 31st day of January, 2012.

Fred M. Gibler, District Judge

## CERTIFICATE OF MAILING

I hereby certify that on the 31 day of Jan, 2012 copies of the foregoing Order Judgment & Sentence were mailed, postage prepaid, or sent by facsimile or inter office mail to:

Defense Attorney – Erik Smith

Idaho Department of Correction
Certified copy Faxed to (208) 327-7445

Prosecuting Attorney

SCSO

Probation and Parole – fax 208-769-1481

CLERK OF THE DISTRICT COURT
SHOSHONE COUNTY

BY Clara Jones

4.

242