RAÚL R. LABRADOR
Attorney General
State of Idaho

MARK W. OLSON, ISB #7555
Deputy Attorney General
Capital Litigation Unit
Criminal Law Division
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone: (208) 334-4539
Facsimile: (208) 854-8074
Email: mark.olson@ag.idaho.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| MARK DOUGLAS HUBER, | ) | CASE NO. 1:23-CV-00039-DKG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | REPLY BRIEF IN SUPPORT OF |
| | ) | RESPONDENT'S MOTION FOR |
| RANDY VALLEY, | ) | SUMMARY DISMISSAL |
| | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

COMES NOW, Respondent, Randy Valley ("state"), by and through his attorney, Mark W. Olson, Deputy Attorney General, Capital Litigation Unit, and hereby submit this reply brief in support of the Respondent's Motion for Summary Dismissal (Dkt. 10), of Petitioner's ("Huber") federal habeas petition (Dkt. 1).

In the state's motion for summary dismissal and brief in support, it argued that each of Huber's federal habeas claims are procedurally defaulted, and that no cause and prejudice exists to excuse those defaults. Huber, the state argued, failed to fairly present any federal

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -*
*1*

constitutional claims in his direct appeal; did not appeal from the trial court's denials of his motions for new trial; voluntarily dismissed his successive post-conviction appeal; failed to attempt to raise Claims 1(A)(ii) and 1(D) in his initial post-conviction appeal; and failed to raise any of his other habeas claims in his initial post-conviction appeal in a procedurally proper manner, resulting in the Idaho Court of Appeals' application of an independent, well-established, and consistently applied procedural bar to reject Huber's claims.  (Dkts. 10, 10-1.)

In response, Huber contends: (1) this Court should employ leniency in evaluating whether his *pro se* post-conviction appellate briefing was sufficient to properly exhaust his claims, and conclude that he fairly presented his habeas claims to the Idaho Court of Appeals; (2) any procedural default of his ineffective assistance of trial counsel claims should be excused pursuant to the doctrine set forth in Martinez v. Ryan, 566 U.S. 1 (2012); and (3) any procedural default of his habeas claims should be excused pursuant to the actual innocence exception.  (Dkt. 14.)

While the state generally relies on the arguments previously set forth in its brief in support of its motion for summary dismissal, it will respond to some of the arguments contained in Huber's response brief.

A:      State Procedural Bar

In its brief in support of its motion for summary dismissal, the state argued that while Huber attempted to raise most of his federal habeas claims in his *pro se* initial post-conviction appellate brief, the Idaho Court of Appeals declined to reach the merits of any of these claims and instead applied a well-established, consistently applied, and independent state procedural bar to reject them.  (Dkt. 10-1, pp.11-15.)  Specifically, the Court deemed Huber's claims to be waived because they amounted to only a "general attack on the findings and conclusions

supporting the [state] district court's summary dismissal determination" and were not supported with "cogent argument and citation to legal authority." (Id.; *see also* State's lodging E-6).

In response, Huber does not contend that the procedural bar applied by the Idaho Court of Appeals was not well-established, consistently applied, or independent; nor does he contend that the Court did not actually apply the bar. (*See* Dkt. 14, pp.6-11.) Instead, Huber first contends that as a *pro se* appellant, he is entitled to a more lenient application of federal habeas exhaustion requirements. Id. (citing Slack v. McDaniel, 529 U.S. 473, 487 (2000) (recognizing that the federal exhaustion requirement was not intended "to trap the unwary *pro se* prisoner"); Peterson v. Lampert, 319 F.3d 1153, 1159 (9th Cir. 2003) (*en banc*) ("when a document has been written by counsel, a court should be able to attach ordinary legal significance to the words used in that document", but "for purposes of exhaustion, counseled petitions in state court may, and sometimes should, be read differently from pro se petitions."); Sanders v. Ryder, 342 F.3d 991, 999 (9th Cir. 2003) ("for the purposes of exhaustion, pro se petitions are held to a more lenient standard than counseled petitions").) Huber argued that, considering the inherent challenges facing an incarcerated *pro se* litigant, his appellate briefing was effective enough to put the Idaho Court of Appeals on notice as to the nature and federal basis of his claims. (Id.)

While Huber is correct that some federal courts have granted leeway to *pro se* litigants in determining whether they have *exhausted* their federal habeas claims in state court, that is not the question before this Court. Here, the claims Huber attempted to raise in his initial post-conviction appellate briefing are procedurally defaulted not due to lack of exhaustion, or because the Court of Appeals did not recognize the claims, but because of the *state procedural bar* applied by the Court in determining that the claims were waived. In determining whether federal habeas claims have been procedurally defaulted in this matter, a federal court may *only* consider

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -
3*

whether the state court decision, in fact, rested on a state law ground independent of the federal question and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–730 (1991). Federal habeas courts, in fact, lack jurisdiction to review whether the state court correctly applied state procedural rules. Poland v. Stewart, 169 F.3d 573, 584 (9th Cir. 1999). Therefore, federal habeas courts also lack jurisdiction to essentially override the state court application of state procedural bars. *See* Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to re–examine state-court determinations on state law questions."). The ultimate authority on Idaho law and Idaho procedural bars is the Idaho appellate courts, and their rulings on such bars cannot be re-litigated in federal court.

In this manner, the cases Huber relies on can be distinguished. Slack, Peterson, and Sanders do not concern state court-applied procedural bars, nor do they stand for the proposition that federal district court may disregard state court application of these bars if the habeas petition was *pro se* in the relevant state court proceeding. *See* Slack, 529 U.S. at 487-488 (rejecting state's argument that, following return to federal court after petitioner's attempt to exhaust habeas claims in state court, petitioner should only have been permitted to pursue claims raised in his initial, *pro se* federal habeas petition, and not those developed in state exhaustion proceedings); Peterson, 319 F.3d at 159 (disavowing precedent standing for the proposition that counseled and *pro se* state court filings must be read the same way for purposes of *exhaustion,* but still ultimately holding that the habeas petitioner's reliance on state law in his state post-conviction proceeding precluded exhaustion of federal habeas claim); Sanders, 342 F.3d at 999 (engaging in lenient reading of *pro se* state court briefing and concluding that proper exhaustion occurred where petitioner cited Strickland v. Washington, 466 U.S. 668 (1984) and the Sixth

Amendment in initial briefing of ineffective assistance of trial counsel claims, even though he failed to do so in state petition for review).

Huber also contends that this case belongs to the small category of extraordinary cases in which federal courts have found that a state court's use of a procedural bar did render a habeas claim to be procedurally defaulted. (Dkt. 14, pp.7-8 (citing Sivak v. Hardison, 658 F.3d 898, 907 (9th Cir. 2011) (federal courts may disregard the state court's use of a procedural bar when the state court applied it in "an erroneous and arbitrary manner"); Lee v. Kemna, 534 U.S. 362, 376 (2002) ("[e]xorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of the federal question"); *see also* Walker v. Martin, 562 U.S. 307, 320 (2011) (leaving open the possibility that a state procedural bar may be found to be inadequate when "discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law").

There is nothing extraordinary, arbitrary, novel, or unforeseeable about the Idaho Court of Appeals' application of the state procedural bar in this case. Instead, Huber simply failed to present his claims in a manner in which the Idaho appellate courts could consider them under Idaho law (likely due to, at least in part, as discussed below, the unsupported and conclusory nature of the claims.)

Once again, the cases cited by Huber are distinguishable. In Sivak, 658 F.3d at 906-907, the Ninth Circuit Court of Appeals concluded (for the second time), that Idaho's statutory 42-day deadline in which to bring claims following the imposition of a death sentence was inadequate to block federal consideration of ineffective assistance of counsel claims where the petitioner continued to be represented by his original trial counsel during the 42-day period, because "it is the rare attorney who can be expected to contend on appeal that his representation was so poor

that he deprived his client of a fair trial." (citation omitted.)  In Lee, 534 U.S. at 375-387, the United States Supreme Court identified an "exceptional" circumstance in which a state procedural bar was inadequate to block a federal habeas claim.  Lee's counsel sought, but was denied, an overnight continuance during a trial when a critical, subpoenaed witness had, without explanation, left the courthouse on the last day of trial.  Id. at 365.  The Court reasoned that the state procedural bar requiring such a motion to be in writing and supported by affidavit was not adequate to block a federal habeas claim where: (1) the trial court judge's actual stated reason for denying the motion was something Lee could not counter – that the judge was unavailable the next two days; (2) no published Missouri decision required flawless compliance with the rule in the unique circumstances facing Lee; and (3) the purpose of the rule was satisfied, and Missouri law did not preclude oral continuance motions in these circumstances.  Id. at 381-387.  The Court summarized, "[a]ny seasoned trial lawyer would agree that insistence on a written continuance application, supported by an affidavit, in the midst of trial upon the discovery that subpoenaed witnesses are suddenly absent, would be so bizarre as to inject an Alice-in-Wonderland quality into the proceedings."  Id. at 383 (quotations and citation omitted.)  The circumstances of the present case, consisting entirely of Huber's own *pro se* briefing decisions, did not present the same "bizarre" situational multi-layered challenges as faced by the petitioners in Sivak, Lee, and the other limited types of cases in which such exceptional circumstances were found to be present.  *See e.g.*, Post-conviction Remedies § 24:11 ("State procedural rule is adequate – Exceptional cases").

The Idaho Court of Appeals applied a well-established, consistently applied, independent state procedural bar in declining to reach the merits of any of Huber's initial post-conviction appellate claims.  Because Huber also failed to fairly present any of his federal habeas claims to

the Idaho Supreme Court in any state court proceeding, each of Huber's claims are procedurally defaulted and must be dismissed unless he can demonstrate cause and prejudice or actual innocence.

B.      *Martinez v. Ryan* and *Shinn v. Ramirez*

In his response brief, Huber next argues that the ineffective assistance of trial counsel claims in his habeas petition, even if procedurally defaulted, should be excused pursuant to the doctrine set forth in Martinez v. Ryan, 566 U.S. 1 (2012).  (Dkt 14, pp.11-28.)  However, a review of Huber's briefing, the state court record, and applicable law, reveals that Huber cannot demonstrate he is entitled to application of the Martinez exception because he cannot demonstrate either that any deficient performance of his post-conviction counsel resulted in the procedural default of his claims; or that any of his ineffective assistance of trial counsel claims are "substantial."

In Martinez, 566 U.S. at 4-18, the United States Supreme Court held that habeas petitioners may attempt to establish cause and prejudice for the procedural default of ineffective assistance of trial counsel claims where the state trial court did not appoint counsel in the initial-review collateral proceeding, or where appointed collateral proceeding counsel is ineffective in raising, or failing to raise, an ineffective assistance of trial counsel claim.  In Trevino v. Thaler, 569 U.S. 413, 423 (2013) (citing Martinez, 566 U.S. at 12-15, 16-19) (emphasis omitted), the Court articulated the Martinez test as follows:

> We consequently read [*Coleman v. Thompson*, 501 U.S. 722 (1991)] as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"

and (4) state law requires that an "ineffective assistance of trial counsel [claim] …
be raised in an initial-review collateral proceeding."

As a result of <u>Trevino</u>, <u>Martinez</u> applies to ineffective assistance of trial counsel claims in
Idaho.  *See* <u>State v. Pentico</u>, 265 P.3d 519, 526-527 (Idaho Ct. App. 2011) ("Ordinarily we do
not address claims of ineffective assistance of counsel on direct appeal because the record is
rarely adequate for review of such claims.").

Subsequently, the United States Supreme Court, in <u>Shinn v. Ramirez</u>, 596 U.S. 366
(2022), "clarified how *Martinez* and § 2254(e)(2) are to be applied on habeas corpus review" in
cases where a habeas petitioner seeks to present new evidence to support a <u>Martinez</u> claim.  <u>Row</u>
<u>v. Miller</u>, No. 1:98-CV-00240-BLW, 2023 WL 2744409, at *4 (D. Idaho Mar. 31, 2023)
(unpublished) (decision pending appeal).  The question before the Court in <u>Ramirez</u> was
"whether the equitable rule announced in *Martinez* permits a federal court to dispense with §
2254(e)(2)'s narrow limits" on considering new facts "because a prisoner's state postconviction
counsel negligently failed to develop the state-court record."  596 U.S. at 371.

The Supreme Court rejected that notion, reaffirming the well-established rule that, "under
§ 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent."  <u>Id.</u> at
384.  Consequently, for <u>Martinez</u> claims that are premised on new evidence, "a federal court may
order an evidentiary hearing or otherwise expand the state-court record *only if the prisoner can
satisfy § 2254(e)(2)'s stringent requirements*."  <u>Id.</u> (emphasis added).

 The upshot of <u>Ramirez</u> is that allowing "habeas Petitioners to develop evidence in
federal court for the limited purpose of demonstrating cause and prejudice to excuse procedural
default" under <u>Martinez</u> has now been significantly "reined in."  <u>Bosse v. Davis</u>, No. 1:21-CV-
00256-BLW, 2023 WL 35278, at *2-3 (D. Idaho Jan. 4, 2023).  Now, Section 2254(e)(2) "must
be met before any new evidence can be used."  It is unlikely, post-<u>Ramirez</u>, that petitioners who

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -
8*

were unable provide sufficient factual support for their claims in state court, and then are subsequently precluded from presenting any additional facts in their federal habeas proceeding, can pass through the significantly narrowed <u>Martinez</u> gateway.  *See* <u>Bosse</u>, No. 1:21-CV-00256-BLW, 2023 WL 35278, at *2 (recognizing that the clarification of <u>Ramirez</u> "closes the door on many petitioners' arguments and ability to overcome the procedural default of ineffective assistance of trial counsel claims"); <u>Creech v. Richardson</u>, 59 F.4th 372, 387-388 (9th Cir. 2023) (acknowledging <u>Ramirez</u> "greatly restrict[ed] the circumstances in which a federal habeas court deciding *Martinez* claims may consider evidence beyond that already contained in the state court record"); <u>Row</u>, 2023 WL 2744409 at *5 (noting that in light of the "shifting analytics after *Shinn v. Ramirez*", "for most petitioners, *Martinez* leads nowhere.")

Initially, as Huber acknowledges (Dkt. 14, p.11), the <u>Martinez</u> gateway can only apply to ineffective assistance of trial counsel claims, and thus, could only possibly apply in this case to Claim 1 in Huber's habeas petition (and each of Claim 1's associated sub-claims.)  *See* <u>Davila v. Davis</u>, 582 U.S. 521, 525 (2017); <u>Hunton v. Sinclair</u>, 732 F.3d 1124, 1126-27 (9th Cir. 2013)

Huber's procedurally defaulted ineffective assistance of trial counsel claims can also not pass through the narrowed <u>Martinez</u> gateway because he cannot show that the default was caused by any deficient performance of post-conviction counsel; and because none of his ineffective assistance of trial counsel claims are "substantial."

1.  <u>Huber Cannot Demonstrate That Deficient Performance Of His Post-Conviction Counsel Caused The Procedural Default Of His Ineffective Assistance Of Counsel Claims</u>

In order to demonstrate that deficient post-conviction counsel caused the procedural default of any of his ineffective assistance of trial counsel claims (as required by <u>Martinez</u>), Huber must demonstrate that his post-conviction counsel "was ineffective under the standards of

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -*
*9*

*Strickland*," which in turn requires him to "show not only that [post-conviction] counsel performed deficiently, but also that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different."  Creech, 59 F.4th 387 (citations, internal quotations, and ellipses omitted.)

In this case, Huber cannot make such a showing because the procedural default of his claims is not based upon anything his post-conviction counsel did or did not do, but instead, was due to his own failure, as a *pro se* appellant in his post-conviction appeal, to follow applicable Idaho procedural rules and obtain a merits-based determination of any of his claims.  Huber cannot show, upon this record, that if his post-conviction claims were raised in a different way, or supported with additional or different evidence, that he would have raised them differently on appeal, *and* would have been successful obtaining relief from the state appellate courts.  Notably, each of Huber's ineffective assistance of trial claims were presented, argued, and/or supported with evidence (in some capacity), to the state district court in the initial post-conviction proceeding.  (*See generally* State's lodgings C-2 through C-8.)  The speculative nature of any argument that post-conviction counsel's actions before the default, actually caused that default, preclude Huber's attempt to pass through the narrow Martinez gateway.  *See* Ashley v. Ramirez, 2017 WL 1197702 at *13 (D. Idaho 2017) (unpublished) ("Claims that are defaulted on post-conviction *appellate* review are beyond the scope of *Martinez.*" (emphasis in original).)  Huber has also failed to successfully tie any of post-conviction counsel's actions or inactions to the specific procedural default of any of his individual claims.

Additionally, a review of the post-conviction proceedings reveals that Huber's post-conviction counsel actively sought and developed evidence in an attempt to support Huber's post-conviction claims, which makes it even more unlikely that Huber can demonstrate counsel's

performance was deficient and that he was prejudiced by any deficiency. Huber's post-conviction counsel sought, and successfully obtained from the state district court, the ability to depose Huber's trial counsel - the subsequent deposition addressed most or all of Huber's ineffective assistance of trial counsel claims. (State's lodgings C-3, pp.67-68, 72-74, C-4, pp.147-224.) Huber's post-conviction counsel also sought, and was granted, the right to obtain a DNA expert. (State's lodgings C-3, pp.194-213; C-4, pp.12-40.) Counsel's brief in support of his request for this appointment contained extensive argument and materials regarding the nature of the DNA evidence presented at trial in this case, and communications and preliminary observations about the case from Dr. Greg Hampikian, the DNA expert whom Huber retained. (State's lodgings C-3, pp.194-196, 199-213; C-4, pp.18-20.) Counsel eventually[1] obtained a final DNA report and affidavit from Dr. Hampikian criticizing the state's testing methods. (State's lodging C-6, pp.171-181.)

Both of these events constituted notable accomplishments for post-conviction counsel in this case, because Idaho law does not automatically grant post-conviction petitioners the right to obtain discovery, and is only required where the petitioner demonstrates it is necessary to protect his substantial rights. *See* <u>State v. Abdullah</u>, 348 P.3d 1, 97 (Idaho 2015); I.C.R. 57(b). Also notably, Huber's arguments, made in response to the state's motion for summary dismissal in this

---

[1] Dr. Hampikian's affidavit associated with his final DNA report (which was needed to render the report admissible), was not completed and submitted to the state district court until after the court summarily dismissed Huber's post-conviction petition. However, by then, the substance of Dr. Hampikian's views were known, and in denying Huber's post-judgment motions for relief, the state district court indicated that pre-judgment consideration of the Dr. Hampikian materials would not have changed its decision to grant the state's motion for summary dismissal. (State's lodgings C-5, p.113; C-8, pp.60-63.) Further, as discussed in greater detail below, the state's DNA and other forensic testing was not a significant part of its case against Huber. Huber's trial counsel obtained an acknowledgment from the state's DNA expert that she could not conclude that Huber was the source of the foreign DNA recovered from Huber. (State's lodging A-8, p.307.)

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -*
*11*

proceeding, regarding whether his ineffective assistance of trial claims are "substantial" for _Martinez_ purposes, is based nearly entirely on evidence and argument developed by Huber's post-conviction counsel.  (_See_ Dkt. 14, pp.14-28.)

Ultimately, as the state district court concluded in both dismissing Huber's petition and denying his post-judgment motions (State's lodgings C-5, pp.90-94, 113; C-8, pp.60-63),  even if Huber's post-conviction ineffective assistance of trial counsel claims were not conclusory, and were better supported by admissible evidence, each of the claims would have failed because Huber would have been unable to demonstrate _Strickland_ prejudice in light of the substantial evidence of guilt presented by the state at trial.  In other words, there was nothing post-conviction counsel could have done to overcome _Strickland_'s prejudice prong.

For the forgoing reasons, Huber cannot demonstrate either that his post-conviction counsel was deficient in raising or failing to raise any of his ineffective assistance of trial counsel claims, or that any deficient performance of counsel caused the procedural default of any of those claims.  Huber therefore cannot pass through the _Martinez_ gateway, and his procedurally defaulted ineffective assistance of trial counsel claims must be dismissed.

2.      "Substantial Claims"

The United States Supreme Court has defined a "substantial" claim, in the context of a habeas petitioner's attempt to pass through the _Martinez_ gateway, as one with "merit," noting a procedural default will not be excused if the underlying _Strickland_ claim "is insubstantial, i.e., it does not have any merit or ... it is wholly without factual support."  _Martinez_, 566 U.S. at 14-16; _see also_ _Lopez v. Ryan_, 678 F.3d 1131, 1137-1138 (9th Cir. 2012) ("_Martinez_ requires that a petitioner's claim of cause for a procedural default be rooted in a potentially legitimate claim of ineffective assistance of trial counsel." (internal quotations omitted)).

_REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -_
_12_

Here, while the state does not attempt to engage in a full merits review of each of Huber's ineffective assistance of trial counsel claims, it will discuss them to the extent necessary to support its assertion that they are not "substantial" pursuant to Martinez.

Initially however, as the state district court concluded (State's lodgings C-5, pp.90-94, 113; C-8, pp.60-63), Huber will be unable to demonstrate Strickland prejudice with respect to any of his ineffective assistance of trial counsel claims in light of the substantial evidence of guilt presented by the state at Huber's trial.  Additionally, it will be more difficult for Huber to demonstrate trial counsel deficient performance in light of trial counsel's deposition testimony, which indicated that trial counsel engaged in substantial preparation, reviewed the discovery, and maintained a trial strategy.  (*See* State's lodging C-4, pp.147-224.)

a.    DNA Defense Expert And Preparation For State's Scientific Evidence

In Claim 1(a)(i), Huber contends his trial counsel was deficient for failing to present expert testimony regarding the state's scientific evidence.  (Dkt. 1, pp.6-11.)  This claim is primarily supported by the report and affidavit Huber obtained from Dr. Hampikian during the post-conviction proceeding criticizing the state's testing methods.  (Dkt. 14, pp.14-19; State's lodging C-6, pp.171-181.)  However, as the state district court concluded, Dr. Hampkian's report and conclusions did not contain affirmative evidence of Huber's innocence, did not refute the entirety of the state's scientific evidence, and may have been inadmissible at trial under Idaho law.  (State's lodging C-8, pp.60-62 (citing State v. Caliz-Bautista, 405 P.3d 618 (Idaho Ct. App. 2017) (holding that defense expert's testimony that the state violated its own lab protocols was not admissible either as substantive evidence or as impeachment evidence).)  Had Huber obtained Dr. Hampkian's conclusions prior to the trial, it appears that he would not have been permitted to utilize them, let alone that they would have resulted in an acquittal.

In any event, Huber's trial counsel cross-examined Rylene Nowlin, the state's DNA expert, and obtained an acknowledgment that Huber could not be confirmed as the source of the foreign DNA found on the victim. (State's lodging A-8, p.307.[2])  As the state district court noted, this cross-examination was likely more beneficial to Huber than anything Huber could have obtained from Dr. Hampikian prior to trial.

In support of this claim, Huber also highlights Nowlin's trial testimony that "one in every 230 billion unrelated individuals would be expected to contribute to that mixture" of foreign DNA recovered from the victim. (State's lodging A-8, p.308.)  Huber asserts that his trial counsel was deficient in failing to clarify this testimony to ensure that the jury did not misinterpret it and assume that there was a 230 billion to 1 likelihood that Huber was the source of the foreign DNA. (Dkt. 14, pp.15-16, 19.)  However, Huber cannot effectively support an ineffective assistance of trial counsel claim through a speculative assumption that the jury misunderstood the trial testimony.  Further, even if a juror were theoretically confused by this testimony, Huber's trial counsel *did* clarify, on cross-examination, that Huber could not be confirmed as the source of the foreign DNA.  (State's lodging A-8, p.307.)  Therefore, defense expert witness testimony clarifying Rowlin's testimony on this point would have been merely cumulative.

b.   Confrontation Clause Violation

In Claim 1(a)(ii), Huber contends his trial counsel was ineffective for failing to object, on confrontation clause grounds, to the admission of a report containing a non-testifying laboratory analyst's conclusions. (Dkt. 1, pp.12-13.)  The report in question, based upon testing conducted

---

[2] Approximately contemporaneous with the filing of this brief, and for the convenience of the parties and this Court, the state will lodging a different version of the transcript of the underlying trial.  (State's lodging A-8.)  This version, unlike the version previously lodged by the state (State's lodging A-3), contains only one transcript page per electronic file page, and is searchable as a PDF document.  The transcripts are otherwise identical.

by state forensic scientist Kerry Russell, revealed that a single spermatozoa (insufficient for further testing), was recovered from the victim's underwear.  (State's lodging C-3, pp.192-193.)  Huber stipulated to the admission of this report at trial.  (State's lodging A-8, p.297.)   The prosecutor did not elicit substantive testimony about the report from the state's testifying DNA expert (who tested the swabs from the victim's rape kit, and discovered the presence of saliva and foreign DNA on the victim).  (*See* State's lodging A-8, pp.286-311.)

In <u>Melendez-Diaz v. Mass</u>, 557 U.S. 305 (2009), the United States Supreme Court held it was a violation of the Sixth Amendment right of confrontation for a prosecutor to submit a chemical drug test report without the testimony of the person who performed the test.  However, as the Supreme Court also explained, a criminal defendant can stipulate to waive such testimony:

> Defense attorneys and their clients will often stipulate to the nature of the substance in the ordinary drug case.  It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt on the forensic analysis.  Nor will defense attorneys want to antagonize the judge or jury by wasting their time with the appearance of a witness whose testimony defense counsel does not intent to rebut in any fashion.

<u>Melendez-Diaz</u>, 557 U.S. at 328: *accord* <u>Bullcoming v. New Mexico</u>, 564 U.S. 647, 651 (2011) (interpreting <u>Melendez-Diaz</u> to hold "[a]bsent stipulation, ... the prosecution may not introduce a [forensic laboratory report stating that a suspect substance was cocaine] without offering a live witness component to testify to the truth of the statements made in the report").

Here, there is nothing indicating that Russell's presence at the trial would have benefitted Huber's defense.  Therefore, regardless of any underling confrontation issues, Huber cannot show that his trial counsel was deficient for stipulating to the admission of the exhibit, or was prejudiced by this stipulation.

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL - 15*

c.      Huber's Vasectomy

In Claim 1(a)(iii), Huber asserts his trial counsel was ineffective for failing to present evidence of Huber's vasectomy, which, according to Huber, precluded him from being the source of the single spermatozoa recovered from the victim's underwear.  (Dkt. 1, pp.13-15.) Huber asserts that he told his trial counsel about his vasectomy prior to trial.  (State's lodging C-2, p.167.)  While Huber has presented evidence that he did indeed have a vasectomy (State's lodging C-2, pp.174-177), he has not pointed to evidence demonstrating that a vasectomy in general, or his in particular, entirely precludes an individual from being the source of a *single* recovered spermatozoa.  Further, Huber's vasectomy *was* mentioned at the trial, during the testimony of the doctor who treated the victim.  (State's lodging A-8, pp.88-89.)  The doctor testified that the victim relayed to him Huber's statement that the victim shouldn't worry about getting pregnant, because he had a vasectomy.  (Id.)  Other than this fact of Huber's vasectomy, which was before the jury, Huber has identified no other evidence related to the vasectomy, scientific or otherwise, that would have benefitted his defense if presented by his trial counsel.

d.      Officer Yergler's Testimony About Huber's Statements

In Claim 1(b), Huber contends his trial counsel was ineffective for failing to impeach state witness Officer Gary Yergler's testimony about admissions Huber made to him.  (Dkt. 1, pp.16-18.)  Officer Yergler testified that while transporting Huber to the jail for execution of a detention warrant on Huber's person, Huber made various statements to him.  (State's lodging A-8, pp.135-139.)  The first thing Huber said, according to Officer Yergler, was "I thought that girl was old enough," and then, "I didn't know that girl was underage."  (State's lodging A-8, p.139.) In response to the prosecutor's question on direct examination about whether Huber later indicated that he had sexual contact with the victim, Officer Yergler responded, "I never asked

that question."   (Id.)   Defense counsel cross-examined Officer Yergler on the fact that these statements purportedly made by Huber did not appear in the officer's corresponding police report.   (State's lodging A-8, pp.140-142.)   Officer Yergler further testified upon cross-examination that he recorded "[p]art of the conversation" with Huber, but shut his recorder off after Huber "quieted down."  (State's lodging A-8, pp.141-142.)

Huber obtained a copy of this audio recording (which was disclosed to him prior to trial), and submitted it with his response brief in this habeas proceeding, along with a transcript of the recording.   (Dkt. 16, pp.2-3, 9-13.)   Huber did not submit this recording or transcript in the course of his post-conviction proceedings in state court.   Because they were not a part of the state record, consideration of this recording and transcript is precluded pursuant to Shinn v. Ramirez.

In any event, even consideration of the recording does not disprove Officer Yergler's testimony, let alone demonstrate Strickland deficient performance and prejudice with respect to the corresponding ineffective assistance of trial counsel claim.   The first statement in the audio recording and transcript (Officer Yergler stating, "Well, there will be plenty of time to tell it") does not appear to depict the beginning of the conversation – instead Officer Yergler seems to be responding to something.   (Dkt. 16, p.9.)   This is consistent with his trial testimony that Huber initiated the conversation.   (State's lodging A-8, p.138.)   It is therefore possible that Huber's statements in question were made to Officer Yergler before the recording started.   Huber's trial counsel may also have been reluctant to delve into the entire portion of the conversation depicted in the audio recording and transcript, during which Huber stated that that the victim's father had "been begging [Huber] for weeks to come up and meet his daughter.   Who [was] supposed to be 18 years old."  (Dkt. 16, p.11.)

e.    Identification

In Claim 1(c), Huber contends his trial counsel was ineffective for failing to impeach the victim's identifications of him.  (Dkt. 1, pp.18-20.)  Huber first contends that the victim's post-incident identification of her assailant was incorrect in several respects, including her statements about the color of Huber's pubic hair, Huber's height and weight, and whether Huber's head was shaved.  (*See* Dkt. 14, p.23.)  These descriptions come from a police report that Huber submitted in support of his successive post-conviction petition.  (State's lodging F-1, pp.118-119; *see also* Dkt. 14, Exhibit C.)  The evidence Huber asserts demonstrates these descriptions were incorrect comes from photos taken during the execution of the detention warrant on Huber's person, and from unsworn statements made in *pro se* filings, all of which were submitted in the successive post-conviction proceeding.  (State's lodging F-1, pp.98-99, 141, 603-619; *see also* Dkt. 14, p.23.)  Huber also contends that during the trial, the victim identified (through a description of his clothing), Huber's trial counsel as her assailant, rather than Huber.  (*See* Dkt. 14, p.23; State's lodging A-8, p.212 (in-court identification).)  The factual support for this assertion also comes from an unsworn *pro se* filing, again made by Huber in support of his successive post-conviction petition.  (State's lodging F-1, pp.99, 142)

Initially, the state submits, Huber cannot adequately support this claim because he relies upon evidence contained within the *successive* post-conviction proceeding.  The state district court summarily dismissed this petition, concluding that it was barred by I.C. § 19-4908, which prohibits successive post-conviction petitions except in limited circumstances not applicable to Huber's case.  (State's lodging F-1, pp.662-677.)  The evidence Huber attempts to utilize in support of this claim is thus not a part of the proceeding in which the state court decided the merits of the claim, and was presented to the court in a procedurally improper manner (and was

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -*
*18*

also unsworn and inadmissible).  Therefore, this evidence may not be considered by this Court in its evaluation of this claim.  *See*  Row, 2023 WL 2744409 at *6-8, 29 (discussing the definition of the "state court record" under Ramirez, and concluding that "[e]vidence that was presented to, but ultimately not considered by, the state courts falls into a category of the state court record not appropriate for federal district court consideration," (citation and internal quotations omitted), and that federal habeas petitioners may use only those portions of the state court record brought to the state courts in a procedurally proper manner, which does not include evidence accompanying improper successive post-conviction petitions that are summarily dismissed.)

In any event, there is nothing about the evidence presented by Huber with respect to this claim that demonstrates ineffective assistance of trial counsel, or which casts doubt on the victim's identification of Huber.  The victim's description of Huber's pubic hair as "black or dark," and of his weight as being a "little heavy," is not disproven by the photos from the execution of the detention warrant. especially as considered from the perspective of a teenage girl.  (*See* State's lodging F-1, pp.603-619.)  The victim's estimate of Huber's height at 6 feet 2 inches is not so alarmingly different from Huber's self-reported height of 5 feet, 10 inches.  Nor does the victim's description of Huber's head as "shaved," where Huber actually has very short hair, indicate a false identification.  The victim *did* correctly identify Huber's distinctive tattoo. (State's lodgings A-8, pp.139-140, 211-212; F-1, p.118.)  Accuracy of the victim's description of Huber aside, it does not seem plausible that she (who, as Huber acknowledges, met him (Dkt. 14, pp.22-23)), would be confused about who sexually abused her.  That a sex abuse victim did not precisely describe every physical characteristic of her attacker in the aftermath of that attack, is exceedingly more plausible.

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL - 19*

Huber's assertion that the victim identified Huber's counsel as the assailant during her in-court identification is supported only by Huber's own self-serving and non-sworn statements. Even if such an event occurred (and was somehow not referenced in the trial transcript by either party or the judge when it occurred), it would have constituted a failure to identify Huber that the jury could have considered in its deliberations.

f.   Gayanne Windedhal's Testimony

In Claim 1(d), Huber contends his trial counsel was ineffective for failing to impeach state witness Gayanne Windedahl about her purported motives to testify falsely.  (Dkt. 1, pp.21-22.)   At the trial, Windedahl testified that the night of the incident, she was at the victim's father's residence.  (State's lodging A-8, p.319.)  There, she asked if she could use a bathroom in the residence that was accessible by going through a bedroom.  (State's lodging A-8, pp.319-320.)  The victim's father told Windedahl that she could not use the bathroom because the adjacent bedroom was being occupied by his daughter (the victim) and "her boyfriend."  (State's lodging A-8, p.320.)  After using the neighbor's bathroom, Windedahl returned and saw Huber, whom she knew, leave the bedroom.  (State's lodging A-8, p.321.)   Windedahl then made contact with the victim, who appeared upset, had a flushed face, and had marks all over her neck.  (State's lodging A-8, pp.321-322.)  The victim then told Windedahl that Huber sexually abused her and caused the marks on her neck.  (State's lodging A-8, pp.322-323.)

Huber alleged, in a filing made with the state district court in the initial post-conviction proceeding, that Officer Yergler intimidated Windedahl into testifying for the state, and suggested that he could help Windedahl with her probation.  (State's lodging C-3, pp.32-35.)  Huber's assertion references an audio recording of a conversation between Officer Yergler and Windedahl that was disclosed to Huber prior to trial.  (Id.)  In his habeas response brief, Huber

stated that he does not currently have possession of this recording, or other related discovery. (Dkt. 14, p.25 n.3.)  Therefore, it is impossible for Huber to demonstrate that this is a substantial claim; or for the state to meaningfully respond to it.  Even if such discovery were located, it could not, pursuant to <u>Shinn v. Ramirez</u>, support Huber's claim because it was not a part of the state court record.  In any event, it is entirely speculative how effective such purported impeachment material would have been, whether it even would have been admitted at trial, or how Windedahl would have responded to it if given the opportunity.

For the forgoing reasons, Huber has failed to demonstrate that he is entitled to application of the <u>Martinez</u> exception to excuse the procedural default of his ineffective assistance of trial counsel claims.   He has failed to demonstrate that his post-conviction counsel provided deficient performance; or that any deficient performance resulted in the procedural default of any of his ineffective assistance of trial counsel claims (which were rejected by the Idaho Court of Appeals upon the court's application of a state procedural rule).   In the alternative, Huber has also failed to show that any of his ineffective assistance of trial counsel claims are "substantial" for the purposes of <u>Martinez</u>.

III:     <u>Actual Innocence</u>

Huber contends that any procedural default of his habeas claims should be excused pursuant to application of the actual innocence exception.[3]  However, a review of the record and the "new evidence" submitted by Huber, which consists almost entirely of evidence submitted to

---

[3] Huber also contends that his assertion of actual innocence is a cognizable federal habeas claim. (Dkt. 14, p.28 n. 4.)  The state adopts its previous argument set forth in its brief in support of its motion for summary dismissal for the proposition that such a claim is non-cognizable and must be dismissed.  (Dkt. 10-1, pp.8-9.)

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -*
*21*

the state district court in the course of his unsuccessful post-conviction proceedings, reveals that Huber cannot meet the relevant standard for application of the actual innocence exception.

Where a habeas petitioner's claims are procedurally defaulted and cause and prejudice for the default are not established, the merits of such claims may be considered only if the petitioner demonstrates "actual innocence."  Murray v. Carrier, 477 U.S. 478, 496 (1986).

In Schlup v. Delo, 513 U.S. 298, 324 (1995), the United States Supreme Court explained, "[t]o be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." The scope of this miscarriage of justice exception requires that Huber demonstrate "'it is more likely than not that no reasonable juror would have convicted him in light of the new evidence' presented in his habeas petition."  Calderon v. Thompson, 523 U.S. 538, 559 (1998 (quoting Schlup, 513 U.S. at 327).  In other words, it must be more likely than not that *every* reasonable juror would have voted to acquit Huber if they had access to the new evidence.

When considering a gateway claim of actual innocence, the federal district court must consider *all* of the evidence, "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 537-538 (2006) (citations and internal quotations omitted).  While evidence thus does not have to be admissible pursuant to state law to be considered in a Schlup analysis, an exhibit's admissibility or lack thereof logically speaks to how "reliable" it is, and how much evidentiary weight should be afforded to it.  *See e.g.*, McGowen v. Thaler, 675 F.3d 482, 500-501 (5th Cir. 2012) (referencing the inadmissibility of several hearsay affidavit statements utilized by McGowen to attempt to demonstrate actual innocence in habeas

proceeding). Further, while the subject of a circuit split, *see* <u>Cleveland v. Bradshaw</u>, 693 F.3d 626, 633 (6th Cir. 2012), there is no requirement, in the Ninth Circuit, that evidence be "newly discovered" in order to be considered in a <u>Schlup</u> actual innocence analysis – it need merely to have not been presented at trial. *See* <u>Griffin v. Johnson</u>, 350 F.3d 956, 961-963 (9th Cir. 2003).

While impeachment evidence may likewise be considered in a <u>Schlup</u> analysis, the United States Supreme Court has noted that such evidence is "a step removed from evidence pertaining to the crime itself" and may thus not be as compelling as direct evidence of innocence. <u>Calderon</u>, 523 U.S. at 563 (citing <u>Sawyer v. Whitney</u>, 505 U.S. 333 (1992); *see also* <u>Munchinski v. Wilson</u>, 694 F.3d 308, 335-336 (3rd Cir. 2012) (citations omitted) ("[w]e acknowledge that mere impeachment evidence is generally not sufficient to show actual innocence by clear and convincing evidence," and distinguishing such "*mere* impeachment evidence" from the evidence presented by petitioner in that case, which "clearly and convincingly show[ed] that the murders *could not* have happened as the Commonwealth proposed at trial") (emphasis in original); <u>Gandarela v. Johnson</u>, 286 F.3d 1080, 1086 (9th Cir. 2002) (concluding that while submitted evidence "may have provided potential grounds for impeachment, speculative and collateral impeachment falls far short of showing actual innocence.").

For similar reasons, other types of evidence that does not *affirmatively* establish innocence, such as the discovery, after trial, of a competing expert witness critical of the state's trial expert witness, does not establish actual innocence. *See e.g.*, <u>Cruz v. Stephens</u>, 2016 WL 3829656 at *3 (W.D. Tex. 2016) (unpublished) (rejecting petitioner's <u>Schlup</u> claim, which was based upon the discovery of a competing expert who rebutted certain trial testimony, because a reasonable juror could easily decide to credit one competing expert over the other); <u>Keaton v. Folino</u>, 2018 WL 8584252 at *53 (E.D. Pa. 2018) (unpublished) ("*Schlup* requires much more

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL -*
*23*

than simply squaring up two competing expert opinions."); <u>Hall v. Superintendent</u>, 834 F.Supp.2d 848, 860-861 (N.D. Ind. 2011) (judgment vacated on other grounds) (in rejecting habeas petitioner's <u>Schlup</u> claim, stating that "the introduction of a divergent expert opinion does not demonstrate innocence") (vacated on other grounds).

The overall formulation of the <u>Schlup</u> actual innocence standard "ensures that petitioner's case is truly extraordinary, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." <u>House</u>, 547 U.S. at 536-537 (citations and internal quotations omitted.)  Cases where the <u>Schlup</u> standard has been satisfied have "typically involved dramatic new evidence of innocence." <u>Larsen</u>, 742 F.3d at 1096.  Ultimately, successful gateway claims of actual innocence are "extremely rare." <u>Schlup</u>, 513 U.S. at 321.

In this case, in support of his assertion of actual innocence evidence, Huber relies upon the evidence referenced above that he utilized in support of his ineffective assistance of trial counsel claims (Dr. Hampikian's final DNA report and affidavit; the victim's purported inaccurate descriptions in identifying Huber to police, and her allegedly incorrect in-court identification; and purported evidence of Gayanne Windedahl's motive to testify falsely); as well as the audio recording of Officer Yergler's interaction with Huber.  (Dkt. 14, pp.28-29.)

This evidence is not sufficient to satisfy the exacting <u>Schlup</u> actual innocence standard. Rather than provide affirmative evidence of his innocence, Huber's evidence collectively attacks the evidence presented by the state.  In addition to the limited substantive and  probative value of the evidence (as discussed above in the context of the state's discussion of whether Huber's underlying claims are "substantial"), it is speculative, at best, how such evidence would have impacted the trial, including how and whether the state would been able to explain or respond to the evidence upon redirect examination of the impacted witnesses.  While inadmissible evidence

may be considered in a determination of whether a habeas petitioner has demonstrated actual innocence, Huber's unsupported statements made in unsworn state court filings should be given little, if any weight.

Further, as also discussed above, and as the state district court recognized throughout the post-conviction proceedings (State's lodgings C-5, pp.90-94, 113; C-8, pp.60-63), the state's evidence of Huber's guilt was substantial.  This evidence included the victim's detailed account of Huber's conduct, which was corroborated by the treating physician's observations and testimony about the victim's statements made to him, photographs of the victim's injuries, Windedahl's testimony about her observations and the victim's statements to her the night of the incident, the recovery of foreign saliva and spermatozoa from the victim, and the victim's testimony that her father arranged the encounter between herself and Huber.  (*See* State's lodgings A-8, pp.201-229, 271-280, 286-311, C-5, pp.68-81, 92; *see also* State's lodging A-8, pp.379-387, 394-403 (the prosecutor's closing and rebuttal arguments at trial summarizing the state's trial evidence.)  In light of the limitations of the evidence presented by Huber, and the strength of the state's evidence of Huber's guilt, Huber cannot demonstrate that it is more likely than not that *every* reasonable juror would have voted to acquit him if they had access to the new evidence.  Huber therefore has failed to demonstrate he is entitled to application of the actual innocence exception.

Each of Huber's federal habeas claims are procedurally defaulted and must be dismissed. The state therefore respectfully requests that this Court grant the state's motion for summary dismissal and to dismiss, with prejudice, each claim in Huber's Petition for Writ of Habeas Corpus.

*REPLY BRIEF IN SUPPORT OF RESPONDENT'S MOTION FOR SUMMARY DISMISSAL - 25*

DATED this 11th day of December, 2023.

/s/ _____
MARK W. OLSON
Deputy Attorney General
Capital Litigation Unit

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on or about the 11th day of December, 2023, I caused to be serviced a true and correct copy of the foregoing document by the method indicated below, postage prepaid where applicable, and addressed to the following:

Craig H. Durham                                  _____  U.S. Mail
Ferguson Durham, PLLC                            _____  Hand Delivery
223 N. 6th Street, Suite 325                     _____  Overnight Mail
Boise, ID  83702                                         Facsimile
chd@fergusondurham.com
                                                 _____
                                                    X    Electronic Court Filing


/s/ Mark W. Olson
MARK W. OLSON
Deputy Attorney General
Capital Litigation Unit